IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| DENISE KAY BOUGHNER, | ) | Case No. 4:16-cv-1858 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.    Introduction

Plaintiff, Denise Kay Boughner ("Boughner"), seeks judicial review of the final decision

of the Commissioner of Social Security ("Commissioner") denying her applications for

supplemental security income ("SSI"), disability insurance benefits ("DIB"), and a period of

disability under Titles II and XVI of the Social Security Act.  This matter is before the court

pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because the ALJ supported his decision with substantial evidence and made no error in

his application of law, I recommend that the final decision of the Commissioner be AFFIRMED.

## II.    Procedural History

Boughner previously filed applications for disability benefits which were denied by ALJ

Charles Shinn on August 28, 2012. (Tr. 68-79)  The current ALJ, M. Scott Kidd, considered

*Drummond v. Comm'r of Soc. Sec.,* 126 F.2d 837, 842 (6th Cir. 1997) but found that new and

material evidence documented a change in plaintiff's condition so he was not bound by the prior

ALJ's decision. Plaintiff does not argue that ALJ Kidd erred in coming to that conclusion. Thus, the prior ALJ's decision is not pertinent to this court's review.

Boughner protectively filed an application for SSI and an application for DIB on October 19, 2012. (Tr. 50) Boughner alleged disability based on lower back, neck, shoulders and arm pain, diabetes and arthritis. (Tr. 92) Boughner's applications were denied initially on February 25, 2013 (Tr. 98) and upon reconsideration on September 24, 2013. (Tr. 130-131) Boughner requested a hearing on October 8, 2013. (Tr. 137) A hearing before ALJ M. Scott Kidd took place on March 16, 2015. (Tr. 11, 50) On May 7, 2015, the ALJ denied Boughner's claims for benefits. (Tr. 47-62) The Appeals Council denied review of the ALJ's decision on June 1, 2016, rendering the ALJ's May 7, 2015 decision the final decision of the Commissioner. (Tr. 1-6)

## III. Evidence

### A. Personal, Educational, and Vocational Evidence

Boughner was 49 years old on the date of the hearing. (Tr. 18) She had a high school education. (Tr. 18) Her past work experience included work as a store laborer; order clerk; and retail manager. (Tr. 41)

### B. Medical Evidence

Plaintiff's primary medical complaint is that she suffers from pain in her neck, shoulders and back. (Tr. 24-25) Plaintiff also has diabetes and a thyroid condition and has seen a cardiologist on multiple occasions. (e.g., Tr. 428-432, 453, 917, 929-933) However, because plaintiff's arguments are not focused upon these conditions, they are only discussed as necessary in the analysis section of this report and recommendation.

On April 10, 2012, Dr. Kene Ugokwe performed a cervical discectomy and fusion of plaintiff at C5-C6 and C6-C7. (Tr. 294-324, 326-82) At her one month follow-up visit, Dr.

Ugokwe also noted that films of plaintiff's neck looked good and she was neurologically stable. (Tr. 467-68)  Dr. Ugokwe referred plaintiff to physical therapy.  (Tr. 551-628)  Plaintiff began physical therapy on July 16, 2012 and was discharged on July 31, 2012. (Tr. 611-626)  In July 2012, plaintiff reported that she had some pain.  (Tr. 628)  Plaintiff went to pysical therapy twice in August.  She reported that her neck and upper back were very painful. (Tr. 569)

On September 24, 2012, plaintiff went to the emergency room with neck pain radiating into her arms. (Tr. 508)  Plaintiff was found to have normal strength, reflexes and muscle tone. (Tr. 508)  Her coordination and gait were also normal. (Tr. 508)

In February 2013, plaintiff complained of worsening pain in her neck. (Tr. 526)  Physical examination revealed normal strength, reflexes, muscle tone; normal coordination and gait; no atrophy, nerve deficit or sensory deficit. (Tr. 526)  Dr. Ugokwe noted that plaintiff was neurologically stable and he ordered diagnostic testing. (Tr. 526)  The MRI of her lumbar spine showed mild disc bulges at L4/L5 and L5/S1 and a small central disc protrusion at L5/S1 causing mild bilateral neural foraminal narrowing. (Tr. 492)

Right shoulder x-rays taken in April 2013 showed tendinitis and mild arthritic changes. (Tr. 531)  Cervical spine x-rays showed stable postoperative changes. (Tr. 532)

In April 2014, plaintiff continued to report neck and shoulder pain to Dr. Ugokwe. (Tr. 627)  He reviewed the MRI and CT images with her and told her that he did not recommend surgery.  (Tr. 627)  He referred her to a rheumatologist. (Tr. 627)

Plaintiff met with the rheumatologist, Dr. Ralph Rothenberg, on July 30, 2014. (Tr. 546-549)  He noted that her BMI was 33.6 and that she had grip strength of 35 on the left and 40 on the right.  Dr. Rothenberg's notes state that plaintiff admitted to stress incontinence. (Tr. 548)  Dr. Rothenberg did not see any evidence of any major systemic rheumatic disease but, because plaintiff had loss of muscle mass in her right leg, he felt that her lumbar disc disease required

further evaluation. (Tr. 549)  He diagnosed cervical and lumbar spondylosis with myelopathy. (Tr. 549)

Plaintiff saw Dr. Mary Anne Macciocca on August 13, 2014. (Tr. 811-820)  Plaintiff was given an ankle brace and referred to physical therapy for her chronic neck and back pain. (Tr. 813)  Oxycodone was prescribed for pain. (Tr. 816)

Plaintiff continued physical therapy in 2014.  (Tr. 696-730, 852-908)  Notes from August 2014 report muscle wasting across plaintiff's right lower leg, but no loss in muscle strength.  (Tr. 702-703)  Plaintiff cancelled or failed to attend some of her physical therapy appointments. (Tr. 852, 859, 870)

An MRI taken on December 18, 2014 showed minor degenerative changes in plaintiff's lumbar region with a mild posterior bulging disc at LR-L5 and L5-S1. (Tr. 975)

Plaintiff saw Dr. Stephanie Kopey, a pain management specialist, in January and February 2015 for left shoulder and neck pain. (Tr. 977-86)  Plaintiff complained of worsening pain when raising her shoulder. (Tr. 982)  She was not experiencing any paresthesia or weakness, but had swelling in her left shoulder. (Tr. 982)  Dr. Kopey diagnosed impingement syndrome of shoulder, swelling in chest, and acute shoulder pain.  (Tr. 985)  She prescribed pain medication, ordered diagnostic testing and recommended home exercises. (Tr. 985)  In February 2015, Dr. Kopey noted that plaintiff's pain and ability to function had improved with opioids.  (Tr. 977)  Specifically, Dr. Kopey wrote, "Boughner's pain has been managed chronically with opioids. Functional improvements since starting opioids include: day to day functions ADL's including cooking and cleaning have improved.  These improvements have been maintained with chronic opioid treatment.  There have not been aberrant drug related behaviors observed/reported since the last visit.  There are not adverse effects of the medication."  (Tr. 977)

On March 23, 2015, plaintiff met with Brian Brocker, M.D. for a consultation regarding her complaints of radiating back pain. (Tr. 990-995)  Plaintiff reported chronic back pain and neck pain, muscle weakness in both legs, but no joint pain or stiffness, arm pain or difficulty walking. (Tr. 990)  Dr. Brocker reviewed plaintiff's MRI and diagnosed neural foraminal narrowing at L5-S1 on the right. (Tr. 994)  He did not think her condition was severe enough for surgery and recommended conservative management, therapy and home exercises.  (Tr. 994-995)

### C.    Opinion Evidence

Plaintiff's argues principally that the ALJ failed to comply with Social Security regulations for the handling of treating doctor opinions.  The administrative record, however, contains no treating source opinions on how plaintiff's medically determinable impairments have affected her functional abilities.  I summarize below the sole medical source opinions found in the record:

### 1.    State Agency Reviewing Physicians

Maria Congbalay, M.D. reviewed plaintiff's records in February 2013 and opined that plaintiff had the residual functional capacity to perform sedentary work except she could not climb ladders, ropes or scaffolds, but *could* climb ramps and stairs and crawl occasionally.  Dr. Congbalay noted that plaintiff's RFC was being adopted from the ALJ decision dated August 28, 2012 pursuant to AR 98-4 (*Drummond* ruling.) (Tr. 89)  Linda Hall, M.D., reviewed plaintiff's records in August 2013 and agreed with the opinion expressed by Dr. Congbalay. (Tr. 112-113)

### 2.    State Agency Consultant – Psychologist John J. Brescia, M.A.

Psychologist John J. Brescia performed a consultative psychological evaluation on September 18, 2013. (Tr. 534)  Dr. Brescia noted that plaintiff was not currently involved in any psychiatric or mental health treatment. (Tr. 543)  Plaintiff's limitations primarily arose from neck and back

pain. (Tr. 534) Any of plaintiff's emotional distress came from her physical pain and inability to do things. (Tr. 543) Dr. Brescia assigned a GAF score of 60. (Tr. 542-543) He related that plaintiff was able to understand, remember and carry out simple instructions; and would not have difficulty in interacting appropriately with supervisors and co-workers. (Tr. 544) He felt that she was very concerned about her physical condition; preoccupied with her pain; and would have poor concentration with diminished persistence and pace of performance. (Tr. 544) He also opined that she "might have difficulty at times in handling some of the pressures and demands present in the work setting. She is very concerned about her condition and situation, and may not always deal with situational stressors effectively." (Tr. 544)

### 3. Psychological State Agency Review

Bruce Goldsmith, Ph.D., reviewed plaintiff's medical records in September 2013. (Tr. 111, 126) He opined that plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence and pace; and no repeated episodes of decompensation. (Tr. 111)

### D. Testimonial Evidence

At her March 16, 2015 ALJ hearing, Boughner testified as follows: (Tr. 11-40)

- She is five feet four and a half inches. (Tr.19)

- At the time of the hearing she weighed 194 pounds. (Tr. 19)

- She is diabetic. (Tr. 31)

- She lives in a ranch style house with her fiancé, who is on disability. (Tr. 18) Her laundry-room is in the basement.

- She previously worked as a stocker at Walmart; a sales associate for Rail Car Services; and a manager at Dollar General. (Tr. 19-21) She stopped working at Walmart, her most recent job, because she was physically unable to do the stocking. (Tr. 23)

- She was in a car accident in 2010 which caused severe neck pain. (Tr. 27)

6

- The main impairment that prevents her from working is the pain she has in her back. (Tr. 24)  She described this pain as starting in her neck and shoulders and radiating down into her arms and lower back.  (Tr. 24)  She experiences numbness in her arm and occasionally drops things.  (Tr. 28-29)  She explained that the pain is most severe on the right side of her lower back. (Tr. 24)  She also stated that the pain traveled down her right leg into her toes. (Tr. 24)

- Plaintiff testified that physical therapy had not helped with her pain. (Tr. 26)  She was scheduled to see a neurosurgeon a few days after her hearing. (Tr. 26)

- Plaintiff normally sleeps about four to five hours per night. (Tr. 32)  She wakes up between 9:00 and 10:00.  (Tr. 33)  She takes her morning medicine and watches T.V. in her recliner. (Tr. 33)  She takes a shower; eats lunch; and returns to her recliner. (Tr. 34)  Later she makes dinner and returns to her recliner.  (Tr. 34)

- Her fiancé does the yard work and goes grocery shopping. (Tr. 34)  Boughner is able to sweep the floor and sweeps one room at a time, every other day. (Tr. 35)  They help one another with the laundry. (Tr. 35)

- She underwent neck surgery in 2012. (Tr. 38)  She has a metal plate and screws in her cervical spine area. (Tr. 38)  Plaintiff's physician instructed her that she was not a candidate for further surgeries, even though she was still experiencing severe pain in her neck. (Tr. 39)

Vocational Expert ("VE") Theresa Wolford also testified during the hearing. (Tr. 40-45)

- Plaintiff's past work was store laborer; order clerk; and retail manager. (Tr. 41)

- The ALJ asked the VE to consider a hypothetical individual with the same education and work experience as plaintiff, who was limited to sedentary work; was limited to only occasional bilateral foot controls; could occasionally climb ramps and stairs, but could never climb ladders, ropes or scaffolds; could occasionally kneel, crouch, balance, stoop, bend; could never crawl; and was required to avoid all exposure to hazards, such as unprotected heights. (Tr. 42)

- The VE opined that this individual could perform plaintiff's past work of order clerk. (Tr. 42)  She could also perform the jobs of telephone quotation clerk; document preparer; and receptionist. (Tr. 42-43)  The VE testified that there were a significant number of national jobs available for these positions. (Tr. 42-43)

- The VE's opinion was not altered with the addition of a limitation for frequent bilateral fine and gross manipulation with no bilateral overhead reaching in all directions.  (Tr. 43)  Nor was the VE's opinion altered when the hypothetical was modified to occasional bilateral fine and gross manipulation as well as occasional reaching bilaterally. (Tr. 44)

- When the ALJ added the limitation that the individual would need to alternate between a sitting and standing position every 30 minutes, the receptionist position could no longer be performed. (Tr. 43)  The other three positions could be performed if the employers were willing to have a sit-stand work station. (Tr. 43)   The VE's opinion did not change when the ALJ added that the individual must be permitted to alternate between sitting and standing positions at will. (Tr. 43)

- The VE's opinion regarding positions available was not altered when the ALJ changed the hypothetical from unskilled to semi-skilled work with no strict time or strict production quotas. (Tr. 44)

- The VE opined that the tolerated rate of an individual being off task was typically 15-20% in addition to regularly scheduled breaks. (Tr. 44)

- The positions identified by the VE would not be available if the individual was required to lie in a reclining position. (Tr. 45)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations:

1. If the claimant is doing substantial gainful activity, she is not disabled.

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

2. If claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment,13 claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents her from doing past relevant work. If claimant's impairment does not prevent her from doing his past relevant work,s he is not disabled.

5. If claimant is unable to perform past relevant work, she is not disabled if, based on her vocational factors and residual functional capacity,s he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V.     ALJ's Findings and Decision

The ALJ issued a decision on May 7, 2015, issuing the following summarized findings:

1. Boughner met the insured status requirements of the Social Security Act through December 31, 2014. (Tr. 53)

2. Boughner had not engaged in substantial gainful activity since August 29, 2012, the alleged onset date. (Tr. 53)

3. Boughner had the following severe impairments: cervical and lumbar spondylosis, status-post cervical spinal fusion; cervical and lumbar degenerative disc disease with radiculopathy; thyroid disorder; diabetes; obesity; carpal tunnel syndrome; tendinitis; and adjustment disorder with mixed anxiety and depressed mood. (Tr. 53)

4. Boughner did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 53-55)

5. Boughner had the residual functional capacity ("RFC") to perform sedentary work except that she would need to alternate between a sitting and standing

position every 30 minutes. She could occasionally climb ramps and stairs, but could never climb ladders, ropes, or scaffolds. She could occasionally kneel, crouch, balance, stoop, and bend, but could never crawl. Boughner could occasionally use foot controls bilaterally and could frequently perform bilateral fine and gross manipulation. She could not reach overhead bilaterally, but could frequently reach in all other directions. She was required to avoid all exposure to hazards such as unprotected heights, and could perform unskilled to semiskilled work with no strict time requirements or high production quotas. (Tr. 56-60)

6.  Boughner was unable to perform any past relevant work. (Tr. 60)

7.  She was born on February 21, 1966 and was 46 years old on the alleged onset date. Her age placed her in a group classified as "younger individual 45-49." (Tr. 60)

8.  Boughner had at least a high school education and was able to communicate in English. (Tr. 60)

9.  Transferability of job skills was not material to the determination of disability because the claimant was "not disabled" whether or not she had transferable job skills. (Tr. 60)

10. Jobs existed in significant numbers in the national economy that Boughner could perform. (Tr. 60)

Based on these findings, the ALJ determined that Boughner was not under a disability since August 29, 2012, the alleged onset date. (Tr. 61)

## VI.     Law & Analysis

### A.      Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied. If not, reversal is required. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D.

Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was

discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS

141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist.

LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S.

Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.      The ALJ's Treating Source Analysis

Although she points to no functional assessment opinions of her treating sources,

Boughner argues that the ALJ failed to apply the treating physician rule in regard to the

information in plaintiff's medical records.[2]  Social Security Administration regulations dictate

how medical opinions must be weighed.  20 C.F.R. § 404.1527(c).  In general, the regulations

require that an opinion from a medical source who has examined a claimant be given more

weight than opinions from a source who has not performed an examination; and an opinion from

a medical source who regularly treats the claimant is afforded more weight than that from a

source who has examined the claimant but does not have an ongoing treatment relationship. *Id.* §

404.1502, 404.1527(c)(1)&(2). *Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 375 (6th Cir.

2013).  In other words, "[t]he regulations provide progressively more rigorous tests for weighing

opinions as the ties between the source of the opinion and the individual become weaker."  *Id.*

*citing* Social Security Rule No. 96–6p, 1996 WL 374180, at *2 (July 2, 1996).

If treating source opinions are (1) "well-supported by medically acceptable clinical and

laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in

[the] case record," then they must receive "controlling" weight. 20 C.F.R. §404.1527(d)(2);

---

[2] ECF Doc. 12, Page ID# 1077.

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009). If the treating source opinion is not given controlling weight, then the ALJ must apply several factors in determining the weight to give the opinion including: the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization; and other factors which support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart,* 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)). These requirements are referred to as the treating physician rule.

"The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544–45 (6th Cir. 2004) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999)) (internal quotations omitted). Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record." *Id.* (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir.2007) (emphasis added)). However, although the regulations instruct an ALJ to consider various factors, they expressly require only that the ALJ's decision include "good reasons ... for the weight ... give[n] [to the] treating source's opinion"—not an exhaustive factor-by-factor analysis. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20

13

C.F.R. § 404.1527(d)(2).

Plaintiff argues that the ALJ did not assign controlling weight to three of her medical records: 1) a record of a follow-up appointment with Cardiologist, Kwon T. Miller (Tr. 910-918); 2) a July 2014 record of an appointment with Dr. Ralph Rothenberg; and 3) unidentified statements from plaintiff's treating physicians regarding plaintiff's chronic pain and pain medications.[3]

The records allegedly mis-handled by the ALJ under plaintiff's theory are not "medical opinions." 20 C.F.R. § 404.1527(a)(2) states that "[m]edical opinions are statements from physicians and psychologists… that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical and mental restrictions." In *Bass v. McMahon,* 499 F.3d 506, 509-510, (6th Cir. 2008), Claimant Bass also argued that the ALJ had failed to provide good reasons for assigning less than controlling weight to a treating physician's opinion. Like Boughner, Bass then pointed to portions of his physician's records to support his argument. Both the district court and the Sixth Circuit rejected his argument. The courts reasoned that the medical records contained observations recorded by the claimant's physician and were likely statements made by plaintiff about his condition. "These observations, without more, were not the type of information from a treating physician which will be provided great weight under 20 C.F.R. § 404.1513(b). *Bass*, 499 F.3d at 510. *See also, Young v. Secretary of HHS,* 925 F.2d 146, 151 (6th Cir. 1990) (holding that a doctor's report that merely repeats a patient's assertions about her level of pain and ability to sleep, stand, and walk is not objective medical evidence).

---

[3] ECF Doc. 12, Page ID #1079-1080.

When a claimant's physician does not make medical judgments, the ALJ does not have a duty to assign controlling weight or provide good reasons for failing to do so. *Bass,* 499 F.3d at 510.

### 1. Cardiologist's Records

The first record plaintiff feels should have been given controlling weight is from a follow-up appointment with Cardiologist, Kwon T. Miller. (Tr. 910-918) Plaintiff argues that this record shows that an EKG revealed nonspecific ST and T wave changes; (Tr. 910-918) that she had concentric left ventricular hypertrophy; Stage I diastolic dysfunction, trace mitral regurgitation, trace tricuspid regurgitation and trace pulmonic regurgitation. (Tr. 453) Plaintiff argues that it would have been appropriate for the ALJ to order the testimony of a medical expert to advise him of the ramifications of plaintiff's heart problems.[4]

Although the data from Dr. Miller's record and the EKG report are not merely subjective statements provided by plaintiff, they also are not "judgments" or "opinions" from plaintiff's treating physicians. As in *Bass v. McMahon*, plaintiff has pointed to specific findings in medical records rather than a medical opinion. Interestingly, neither Dr. Miller, nor the physician who interpreted the plaintiff's EKG, attributed any significance to these findings. Dr. Miller indicated that plaintiff's "stress and echo tests were stable in 3/12" and that plaintiff had "no further symptoms." (Tr. 917) Walter C. Sweeney, D.O., F.A.C.C., reviewed the results of plaintiff's EKG and his impression was that the EKG during infusion did not change; her myocardial perfusion imaging was normal; her left ventricular systolic function was normal without regional wall motion abnormalities; she had a low risk pharmacologic stress test; and the probability of coronary ischemia was low. The "judgments" of these physicians actually weigh against the finding of a disability. There is no opinion from a treating physician indicating that the results

---

[4] ECF Doc. 12, Page ID# 1079.

from plaintiff's EKG had any effect on plaintiff's functional capabilities. Thus, it does not appear that the ALJ improperly rejected any opinion from a treating physician or that he was required to provide good reasons for doing so.

Plaintiff suggests that the ALJ should have ordered a medical expert to testify at the hearing regarding her heart issue.[5] Plaintiff does not cite any legal authority to support this argument. The undersigned is aware that in *Deskin v. Comm'r,* 605 F.Supp.2d 908 (N.D. Ohio 2008), the court held:

> As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases where the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about the functional capacity."

*Id.* at 912. However, the holding of *Deskin* is not representative of the law established by the legislature and interpreted by the Sixth Circuit Court of Appeals. *See Henderson v. Comm'r,* 2010 U.S. Dist. LEXIS 18644 (N.D. Ohio, March 1, 2010, Nugent, J.). Furthermore, two physicians reviewed plaintiff's medical records for the agency and provided opinions regarding her functional limitations. Thus, there are physician opinions regarding plaintiff's functional limitations and they do not contradict any *opinions* given by a treating medical source. As noted above, plaintiff bears the burden of proof to establish her limitations; any failure to produce medical opinions ultimately works against the merits of her claim.

---

[5] Throughout these proceedings, plaintiff has consistently reported that her physical limitations are primarily related to her neck and back pain. (Tr. 24-34, 534) Plaintiff did not mention any functional limitations related to a heart condition. (Tr. 24-40)

## 2.    Grip Strength Testing

Next, plaintiff argues that the ALJ failed to address Dr. Rothenberg's grip strength testing on July 30, 2014.[6]  Plaintiff was referred to rheumatologist, Dr. Rothenberg, by Dr. Ugokwe. (Tr. 546)  The medical evidence contains only one record from Dr. Rothenberg - suggesting that plaintiff met with him once.  In the "Vitals" section of this record, Dr. Rothenberg recorded plaintiff's height, weight, BMI, blood pressure, pain scale and grip strength. (Tr. 547-548)  Plaintiff's grip strength is not otherwise mentioned in Dr. Rothenberg's record.  In the "physical exam" section of the record, Dr. Rothenberg observed normal exam findings for plaintiff's fingers, wrists, elbows, shoulders. (Tr. 548)  It does not appear that he attributed any significance to the grip strength measurements noted in the vitals section of his record.  (Tr. 549)  Dr. Rothenberg did not see evidence for any major systemic rheumatic disease and recommended further evaluation of plaintiff's lumbar disc disease. (Tr. 549)

As with the records from plaintiff's cardiologist, the record of plaintiff's grip strength does not appear to represent any "judgment" or "opinion" regarding plaintiff's functional limitations by Dr. Rothenberg.  Thus, the ALJ was not required to assign controlling weight to this piece of data or to provide good reasons for his failure to do so.  Moreover, because plaintiff only saw Dr. Rothenberg once, he most likely could not be considered a treating source in any event. *See Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 876 (6th Cir. 2007) (finding that a single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship.")

Plaintiff argues that the ALJ was required to consider her grip strength and that he should have included this issue in his hypothetical to the VE.  However, as noted above, there is little

---

[6] ECF Doc. 12, Page ID# 1079.

evidence of plaintiff's hand weakness is the record and Dr. Rothenberg does not seem to attribute any significance to this finding. The record does not contain other references to poor grip strength or hand weakness and it does not appear that plaintiff was consistently complaining of this issue to her medical providers or receiving any treatment for it.

Although the medical notes related to plaintiff's grip strength were originally included as support for her "treating physician" argument, plaintiff's hand weakness or grip strength also seems to relate to the ALJ's assessment of plaintiff's credibility. In her reply brief, plaintiff argues that she complained of weakness in her hands, that she had no grip strength and that she dropped things a lot.[7] These complaints were made when plaintiff filed her disability report and during the administrative hearing.[8] The medical records from plaintiff's physicians do not reflect ongoing complaints regarding hand weakness.[9] In fact, after reviewing plaintiff's systems in February 2015, Dr. Kopey noted that plaintiff was not experiencing any weakness. (Tr. 985)

The ALJ was not required to fully accept plaintiff's subjective complaints regarding hand weakness. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. See *Siterlet v. Sec'y of Health & Human Servs.,* 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be disregarded lightly. See *Villareal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, 1996 SSR LEXIS 4, Purpose

---

[7] ECF Doc. 16, Page ID # 1149.

[8] See ECF Doc. 16, Page ID #1149.

[9] There is also a medical note from the cardiologist's September 2012 appointment, a few months after plaintiff's surgery, indicating that plaintiff was independent with activities of daily living but that she required assistance when "opening jars," "carrying laundry baskets," and "heavy household chores." (Tr. 57, 427)

section; see also *Felisky*, 35 F.3d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"). To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. See SSR 96-7p, 1996 SSR LEXIS 4, Purpose. Beyond medical evidence, there are seven factors that the ALJ should consider. The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. See *Cross,* 373 F.Supp.2d at 733; *Masch v. Barnhart,* 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ determined that plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms were not entirely credible. (Tr. 56) He fully discussed the portions of the medical records which supported his credibility determination, noting that plaintiff was doing well after her surgery; that there were no evident complications; that she was independent with activities of daily living; that when plaintiff met with Dr. Rothenberg, complaining of an increase in neck pain, she was not taking any medication for pain; that plaintiff was turned down by the Tiffany Pain Management Clinic for her chronic back pain, so she began physical therapy in August 2014; that she was ambulating with no difficulties; she reported decreased pain at her third physical therapy session, but then cancelled her next session and did not show up for the session after that; she was then discharged from physical therapy as "resolved;" that Dr. Kopey noted in February 2015 plaintiff's condition was improved somewhat with opioid medication and that she was not mentally or physically impaired with the current prescribed treatment;" that Dr. Brocker conducted a motor exam in March 2015 which was normal but for a minor abnormality in the bilateral biceps and right plantar flexion; that Dr. Brocker did not recommend back surgery; rather he recommended conservative management and therapy. (Tr. 57-58) Finally, the ALJ concluded:

From the above, the claimant has some limitations due to her neck, back, hand, and shoulder pain, as well as from her diabetes and thyroid condition. However, she has often reported doing well following her fusion surgery, and the objective medical evidence simply does not support the claimant's alleged levels of pain. Moreover, the claimant has at times been non-compliant with her diabetic diet and physical therapy program. Finally, the claimant's most recent clinical exams indicate that she is not a candidate for surgery, and would benefit from conservative treatment. Thus, the claimant is capable of performing work at the sedentary exertional level, with the limitations outlined above.

(Tr. 58)

As explained above, the vitals data showing decreased grip strength in Dr. Rothenberg's notes is not entitled to controlling weight. It is not a "judgment" or opinion from a physician and, even if it were, plaintiff has not shown that Dr. Rothenberg was her treating physician. Other than that medical record, plaintiff relies on her own complaints made in her disability report and during the administrative hearing to support her argument that she was not capable of performing sedentary work due to her manipulative limitations. However, the ALJ was not required to believe the severity of plaintiff's complaints and he provided a well-supported credibility determination.

### 3. Chronic Pain and Medication

Finally, plaintiff argues that the ALJ failed to assign controlling weight to unspecified portions of her records reporting chronic pain and pain medication.[10] Plaintiff argues that the ALJ failed to address plaintiff's chronic pain as a severe impairment but never dismissed any of plaintiff's treating physicians' statements and opinions.[11] This last "treating source" issue is difficult to understand. She does not cite specific sections of her medical providers' records but, instead, argues generally about her pain and the effects of taking opioid medications..

---

[10] ECF Doc. 12, Page ID# 1080.
[11] ECF Doc. 12, Page ID# 1080.

It is well settled that pain, if caused by a medical impairment, may be severe enough to constitute a disability. See *Kirk v. Sec' of Health and Human Servs*., 667 F.2d 524, 538 (6th Cir. 1981), cert. denied, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983). When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." SSR 96-7p, 1996 SSR LEXIS 4. Essentially, the same test applies when the alleged disabling condition is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. See *Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994).

Plaintiff does not point to specific medical records or treating physician opinions that support her argument. Nonetheless, the ALJ did consider plaintiff's pain when he discussed the medical record. He determined that she had "some limitations due to her neck, back, hand and shoulder pain." (Tr. 58) However, he noted that she was often reported doing "well" following her fusion surgery; she was not taking anything for pain when she met with Dr. Rothenberg in July 2014; she was improving with physical therapy but then cancelled or didn't show up for appointments. (Tr. 57-58) Thus, the ALJ evaluated whether the objective medical evidence confirmed the alleged severity of pain and found that plaintiff's statements regarding the severity of her pain were not entirely credible.

Plaintiff also contends that the ALJ "did not address plaintiff's pain medications and the affect they would have in a work setting."[12]  However, the ALJ did consider Dr. Kopey's statement that plaintiff's condition improved with opioid medication and that plaintiff was not "mentally or physically impaired on the current prescribed treatment." (Tr. 58)  He also noted that plaintiff was not taking anything for pain when she met with Dr. Rothenberg. (Tr. 57)

Plaintiff does not clearly identify the statements or opinions her treating physicians made in the medical records regarding her pain.  Thus, the court must try to decipher what statements she is referring to and whether the ALJ considered them.  After reviewing the record, the undersigned finds that the ALJ did not reject any treating source *opinions* or *judgments* related to plaintiff's pain because no such opinions or judgments were submitted.  Moreover, it is well established that an ALJ is not required to discuss each and every piece of evidence in the record for his decision to stand. See, e.g., *Thacker v. Comm'r of Soc. Sec.,* 99 Fed. Appx. 661, 665 (6th Cir. 2004).  The undersigned finds that the ALJ properly considered plaintiff's complaints of pain and examined whether the objective medical evidence confirmed the alleged severity of her pain.

The substantial evidence standard presupposes a "zone of choice," within which the ALJ may decide without interference from the courts.  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006).  Even if a reviewing court would resolve the factual issues differently, when supported by substantial evidence, the Commissioner's decision must stand. *See Foster v. Halter,* 279 F.3d 348, 353 (6th Cir. 2001).  The Commissioner's findings on the severity of plaintiff's pain are supported by substantial evidence in the record.  The ALJ did not improperly reject opinions from plaintiff's treating sources.

---

[12] ECF Doc. 12, Page ID# 1080.

C.     Whether the ALJ's Hypothetical Questions to the VE Sufficiently  Described Plaintiff's Impairments.

Plaintiff next argues that the ALJ's hypothetical question to the VE failed to include all of plaintiff's impairments, limitations, and the combined effect of plaintiff's impairments.[13] Specifically, plaintiff contends that the ALJ should have included limitations reflecting plaintiff's decreased grip strength; her testimony regarding the amount of time she could sit and stand; that she should not be around moving parts, machinery, hazards, or hazardous substances; that she would have difficulty at times handling some pressures and demands pressing in the work setting; and that she has stress incontinence.[14]

Before an ALJ moves from Step Three to Step Four, the claimant's RFC is assessed. §§ 404.1520(a)(4), 416.920(a)(4). *Kado v. Colvin,* No. 1:15-cv-02044, 2016 U.S. Dist.LEXIS 143321 (N.D. Ohio., Sept. 7, 2016).  The RFC "is the most you can still do despite your limitations." 20 C.F.R. §§ 404.1545, 416.945.  The final responsibility for deciding the RFC is reserved to the Commissioner. 20 C.F.R. § 416.927(d)(2). "As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence." *Kline v. Astrue,* No. 1:12-CV-01802, 2013 U.S. Dist. LEXIS 66287, 2013 WL 1947164, at *3 (N.D. Ohio Apr. 17, 2013), report and recommendation adopted sub nom. *Kline v. Colvin,* No. 1:12 CV 1802, 2013 U.S. Dist. LEXIS 66285, 2013 WL 1946201 (N.D. Ohio May 9, 2013) (citing 20 C.F.R. § 416.946(c)).  "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (citations omitted).  While the RFC is for the

---

[13] ECF Doc. 12, Page ID# 1082.

[14] Id.

ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that are considered in assessing the RFC. See *Rabbers v. Comm'r Soc. Sec. Admin.,* 582 F.3d 647, 652 (6th Cir. 2009). ("The claimant bears the burden of proof through step four; at step five, the burden shifts to the Commissioner."); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 391 (6th Cir. 1999).

At the outset, the undersigned notes that the ALJ actually did include limitations in his hypothetical questions on the very issues plaintiff raises. The ALJ asked questions about limiting the hypothetical individual to frequent and occasional, bilateral fine and gross manipulation. (Tr. 43, 44) The ALJ's hypothetical questions included a requirement that the individual be permitted to alternate between sitting and standing at will. (Tr. 43) The ALJ's questions also included limitations that the hypothetical individual should: avoid all exposure to hazards; (Tr. 42) be limited to unskilled to semi-skilled work with no strict time or strict production quotas; (Tr. 44) and be permitted to be off task 15-20% of the time. (Tr. 44) Thus, it appears that the ALJ questioned and the VE opined regarding each of the issues identified by the plaintiff in her brief. These issues are discussed further below.

### 1. Decreased Grip Strength

Plaintiff argues that the ALJ failed to include a limitation in his hypothetical questions related to plaintiff's reduced grip strength. As discussed above, Dr. Rothenberg, who recorded plaintiff's grip strength, did not discuss this finding in his medical record. (Tr. 546-547) There is no medical judgment or opinion relating the results of plaintiff's grip strength vitals to her ability to manipulate objects with her hands. Thus, the ALJ did not reject any medical opinion when he formed the hypothetical questions to the VE.

Also discussed above is the ALJ's determination of the credibility of plaintiff's own statements regarding the severity of her physical limitations. Although plaintiff reported that she

had difficulty opening jars, lifting heavy objects, and would sometimes drop things, the ALJ was not required to fully accept her statements and testimony as to the severity of these symptoms.

The ALJ did include limitations in his VE hypotheticals related to plaintiff's ability to manipulate objects. The ALJ asked the VE to consider an individual who could frequently perform bilateral fine and gross manipulation. (Tr. 43) In the social security context, the term "frequent" means between 1/3 to 2/3 of a workday. *See Damron v. Colvin,* 2015 U.S. Dist. LEXIS 155218, at *30 (N.D. Ohio Sept. 3, 2015); *Kolasa v. Comm'r of Soc. Sec.,* 2015 U.S. Dist. LEXIS 30570, 2015 WL 1119953 at * 9 (E.D. Mich. March 11, 2015); *Ferguson v. Comm'r of Soc. Sec.,* 2013 U.S. Dist. LEXIS 32237, 2013 WL 941552 at * 7 (S.D. Ohio March 8, 2013). The VE also testified that her opinion would not change if the hypothetical individual were further limited to occasional bilateral fine and gross manipulation. (Tr. 44) Therefore, plaintiff's argument that the ALJ failed to include limitations regarding grip strength in his hypothetical questions to the VE lacks support from the record.

## 2.      Plaintiff's Credibility

Plaintiff next argues that the ALJ never questioned the plaintiff's credibility, yet the hypothetical question he asked the VE included a sit/stand option where the plaintiff could change positions every 30 minutes. Plaintiff argues that the hypothetical questions should have mirrored her testimony that she could sit for 30 minutes, stand for 15-20 minutes, and that her most comfortable position was in her recliner with her feet elevated.[15]

Plaintiff is incorrect in arguing that the VE never questioned her credibility. He explicitly found that her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. (Tr. 56) Credibility determinations regarding a

---

[15] ECF Doc. 12, Page ID# 1082.

claimant's subjective complaints rest with the ALJ. See *Siterlet v. Sec'y of Health & Human Servs.,* 823 F.2d 918, 920 (6th Cir. 1987). As discussed above, the ALJ did not fully accept plaintiff's testimony regarding the severity of her symptoms and he properly explained his conclusion.

Moreover, the ALJ's hypothetical questions and corresponding RFC were properly based on the evidence of plaintiff's limitations. The ALJ first asked the VE to consider a hypothetical individual who would need to alternate between a sitting and standing position every 30 minutes. (Tr. 43) The VE testified that this individual could still perform the jobs of order clerk, telephone quotation clerk and document preparer. She also testified that employers are often willing to have a sit-stand option in those positions. (Tr. 43) The VE then testified that her opinion would not change if the hypothetical individual required the ability to alternate between sitting and standing positions at will. (Tr. 43) Thus, there was evidence establishing that a significant number of jobs would still exist for an individual who needed to alternate between sitting and standing at will, regardless of the duration of time the individual would be able to stand. (Tr. 43-44) While plaintiff may be most comfortable in her recliner with her feet elevated, the RFC is defined as "the *most* [she could] still do despite [her] limitations." 20 C.F.R. §§ 404.1545, 416.945 (emphasis added). The ALJ was not required to fully accept the credibility of plaintiff's testimony regarding her limitations or to form an RFC determination accommodating plaintiff's preference to recline. Nonetheless, the ALJ's VE hypothetical questions incorporated the limitations that were supported by the relevant evidence in the record including a sit-stand at will option. The undersigned finds that the ALJ's determination of plaintiff's RFC accurately reflected the relevant evidence of plaintiff's symptoms and impairments.

### 3. Avoiding Moving Parts/Hazards due to Pain Medication

Plaintiff next argues that, she is precluded from being around moving parts, machinery, hazards or hazardous substances on a job because she takes pain killing medication.[16] She argues that the ALJ failed to preclude jobs of this nature in his hypothetical questions. Plaintiff has not cited any record supporting this argument and it does not find support from the relevant evidence in the record. When the ALJ formed his first question to the VE, the hypothetical individual was described as needing to "avoid all exposure to hazards, such as unprotected heights." (Tr. 44) Furthermore, there is no medical opinion in the record stating that plaintiff was required to avoid moving parts, machinery or hazards. In fact, there was a note from Dr. Kopey indicating that plaintiff's daily activities had improved with opioid use and there were no adverse effects of the medication. The ALJ included a limitation in his questions to the VE that the hypothetical individual avoid all exposure to hazards even though it is not clear whether such a limitation was necessitated by the medical evidence.

### 4. Difficulty Handling Work Setting Pressures and Demands

Plaintiff also contends that the ALJ failed to include a limitation in his hypothetical questions reflecting Dr. Brescia's opinion that plaintiff may have difficulty at times handling some of the pressures and demands present in a work setting.[17] Because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified," ALJs must consider their findings and opinions. See 20 CFR § 404.1527(e)(2)(i). When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and

---

[16] ECF Doc. 12, Page ID# 1082.

[17] ECF Doc. 12, Page ID# 1082.

expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 CFR § 404.1527(e)(2)(ii). Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight. *Id.*

However, opinions from non-treating sources, such as Dr. Brescia, are not assessed for "controlling weight" and an ALJ is not required to provide "good reasons" for discounting all or part of a non-treating source opinion. See *Gayheart,* 710 F.3d at 376. ("On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'"); *Adams v. Colvin,* 2015 U.S. Dist. LEXIS 102588, 2015 WL 4661512 at * 21 (N.D. Ohio Aug. 5, 2015) ("Dr. House was not Adams' treating physician and, therefore, the ALJ was not required to satisfy the 'good reasons' requirement in rejecting his opinion."); *Taylor v. Colvin,* 2013 U.S. Dist. LEXIS 166274, 2013 WL 6162527 at * 16 (N.D. Ohio Nov. 22, 2013) ("[T]he procedural 'good reasons' requirement does not apply to treating physicians.") Rather, all that is required is that an ALJ consider the findings and opinions of state agency non-treating sources and explain in the decision the weight given to such opinions. See 20 CFR § 404.1527(e)(2)(ii).

At step four, the ALJ discussed the medical evidence regarding plaintiff's mental impairments as follows:

> Turning to the mental health portion of the case, the claimant has never been treated for mental health issues. At a state psychological consultative examination, John Brescia, M.A., found that the claimant met the diagnostic criteria for adjustment disorder with mixed anxiety and depressed mood, and assigned her a GAF of 60 indicating only moderate symptoms. The claimant described herself as not depressed, but "unhappy." She reported having friends, and presented with an appropriate affect and cooperative behavior. The claimant noted that she sometimes becomes angry and yells, and that "little things" bother her more than before. She was also somewhat anxious during the examination.

From the above, the claimant has some limitations due to her adjustment disorder. However she has never sought mental health treatment, and does not appear to view herself as a depressed or anxious individual. Thus, any mental health limitations are accommodated by limiting her to unskilled to semiskilled work with no strict time requirements or high production quotas.

The ALJ then weighed Dr. Brescia's opinion as follows:

The claimant attended a State psychological consultative examination with John Brescia, M.A., on September 18, 2013. Mr. Brescia noted that the claimant had never been treated for mental health issues, and had never taken any medication for anxiety or depression. Mr. Brescia found that the claimant met the diagnostic criteria for adjustment disorder with mixed anxiety and depressed mood, and assigned her a GAF of 60, indicating only moderate symptoms. He opined that the claimant's ability to maintain concentration persistence, and pace was sufficient to perform simple, repetitive tasks, and some familiar routine tasks involving multiple step, but noted that her concentration is poor. He further opined that she would have no difficulty following and carrying out instructions or getting along with others. Finally, Mr. Brescia opined that the claimant might have difficulty at times in handling some of the pressures and demands present in a work setting. This opinion appears somewhat consistent with the record. However, the claimant has no history of mental health treatment, and Mr. Brescia's opinion was fairly vague when describing the claimant's limitations. Thus, I give only some weight to the opinion of Mr. Brescia, as he personally examined the claimant and performed some testing, but am unable to give controlling weight due to its vagueness.

(Tr. 59-60) The ALJ also considered the opinion of Bruce Goldsmith, Ph.D., who reviewed plaintiff's records at the reconsideration level. (Tr. 59) Dr. Goldsmith opined that the claimant had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace and no episodes of decompensation. (Tr. 111-114, 126-129) The ALJ only gave this opinion some weight because he thought that it was somewhat vague and did not fully define all limits. (Tr. 59)

The undersigned finds that the ALJ did not err in his analysis of Dr. Brescia's opinion that plaintiff "might have difficulty at times in handling some of the pressures and demands present in the work setting." The ALJ accommodated this limitation by restricting plaintiff to

unskilled to semiskilled work with no strict time requirements or high production quotas. Dr.

Brescia did not opine any specific limitations that are more restrictive than the mental limitations

in the RFC and the explanation provided by the ALJ satisfies the requirement for non-treating,

examining psychologists. The ALJ did not fail to address Dr. Brescia's opinion in his

hypothetical questions to the VE or when determining plaintiff's RFC.

### 5. Stress Incontinence

Finally, plaintiff argues that the ALJ failed to accommodate plaintiff's limitations due to

stress incontinence.[18] Plaintiff states that she has a C6 problem and one of the effects of a C6

injury is little or no voluntary control over the bladder.[19] Plaintiff contends that the ALJ was

required to include this limitation when he determined plaintiff's RFC.

Plaintiff does not cite any medical records or opinions to support her argument that she

could only perform jobs that would permit her to use the restroom at any time. Although the

note from Dr. Rothenberg's appointment documents plaintiff admitting to stress incontinence

(Tr. 548), the medical evidence also contains notes of plaintiff denying stress incontinence. (Tr.

783, 985) And even though the record reveals a complaint of stress incontinence, there is no

evidence supporting the necessity of an accommodation for that condition. Moreover, the VE

testified that, even if plaintiff were off task 15-20%, there would still be jobs available that she

could perform. (Tr. 44) Thus, even if there was evidence of plaintiff requiring an

accommodation for stress incontinence, the VE's testimony established that there were still a

significant number of jobs in the national economy that plaintiff could perform. (Tr. 44)

Having considered each of the issues raised by plaintiff related to the ALJ's hypothetical

questions, the undersigned finds that the ALJ's assessment of plaintiff's RFC was supported by

---

[18] ECF Doc. 12, Page ID# 1082
[19] Id.

substantial evidence in the record; the ALJ properly included each of plaintiff's limitations in the hypothetical questions to the VE; and the ALJ reasonably relied on the VE's testimony in response to the hypothetical questions.

### D. No Jobs Available for an Individual who is Off-Task 15-20% of the Time

Finally, plaintiff argues that the ALJ failed to recognize that plaintiff's severe impairments would render her off task 15-20% of the time and that no job would be available for such an employee.[20] Plaintiff cites the VE's testimony that employers generally tolerate an individual being off task 15-20 percent in addition to the regular scheduled breaks. (Tr. 44) She then argues that she would be off task more than 15-20% due to her reduced grip strength; effects of her pain medication; difficulty in handling stress; and her stress incontinence. Plaintiff has not cited any medical opinion or other evidence supporting her contention that her conditions would render her off task more than 15-20% of the time. Instead, she relies on her own testimony to support her contention that she would be off task 15-20% of the time. Each of plaintiff's conditions (which she argues would take her off task) and the objective medical evidence has been fully discussed above. As noted earlier, the ALJ did not fully accept plaintiff's credibility as to the severity of her limitations and he explained his opinion.

The undersigned finds that substantial evidence supported the ALJ's determination of plaintiff's RFC, and he did not err in failing to conclude that she would be off task more than 20% of the time. The ALJ properly relied on the VE's testimony that a significant number of jobs would be available for an individual with plaintiff's RFC. The undersigned recommends that ALJ's decision be affirmed.

---

[20] ECF Doc. 12, Page ID# 1083.

## VII.   Recommendation

The ALJ did not err in considering and weighing the medical evidence submitted in this case.   Nor did he err in his determination of plaintiff's RFC or in forming hypothetical questions to the VE.   The ALJ supported his with substantial evidence in the record.   For these reasons, I find that Boughner has not demonstrated a basis upon which to reverse or remand the Commissioner's decision, and I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. §405(g).


Dated: May 22, 2017

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.   Failure to file objections within the specified time may waive the right to appeal the District Court's order.   See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).   See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).